ALPHONSUS E. MCCARTHY, JR. *vs.* LITTON INDUSTRIES, INC.

Plymouth. January 7, 1991. - May 7, 1991.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR & GREANEY, JJ.

*Corporation*, Corporate successor liability. *Sale*, Warranty. *Warranty*. *Practice, Civil*, Retroactivity of Judicial Holding. *Uniform Commercial Code*, Warranty, Sale of goods. *Evidence*, Expert opinion.

In a breach of warranty of merchantability action, there was no merit to the defendant's contention that another corporation had succeeded to the liability of the manufacturer of a defective lathe through the purchase of the manufacturer's assets, where the purchasing corporation was not shown to be "merely a continuation" of the selling corporation. [21-23]

Discussion of the implied warranties of merchantability set forth in the Uniform Sales Act, G. L. c. 106, § 17 (2) (Ter. Ed.), and, after its adoption in 1958, set forth in the Uniform Commercial Code, G. L. c. 106, §§ 2-314 to 2-318. [23-26]

With respect to a claim of breach of warranty of merchantability against the successor to liability of the manufacturer of a lathe sold in 1948, the implied warranty of merchantability provision of the then applicable Uniform Sales Act, as construed in *Mead* v. *Coca Cola Bottling Co.*, 329 Mass. 440, 442 (1952), imposed the same requirements as does the warranty imposed by the present Uniform Commercial Code, G. L. c. 106, § 2-314 (2) (*c*). [26]

In an action for breach of warranty of merchantability for failure to have warned against dangerous modifications to a lathe, where the jury found that the plaintiff's misuse of the lathe was not a proximate cause of an industrial accident, the plaintiff was not barred from recovery by that misuse. [26-27]

At the trial of a breach of warranty action the judge properly qualified a witness as an expert and allowed him to offer his opinion as to how an industrial accident occurred. [27]

CIVIL ACTION commenced in the Superior Court Department on November 9, 1981.

The case was tried before *William H. Carey*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*John J. McGivney* (*Christopher A. Duggan* with him) for the defendant.

*Thomas J. Lynch* (*Alexandra B. Harvey* with him) for the plaintiff.

LYNCH, J. This is a product liability action arising out of an accident in which the plaintiff, Alphonsus E. McCarthy, Jr., was injured while operating a glass-working lathe. The case was submitted to a Superior Court jury on a breach of warranty theory. In answers to special questions, the jury found that the manufacturer had breached its implied warranty of merchantability by failing to warn against dangerous modifications to the lathe. The defendant moved for judgment notwithstanding the verdict in part on the ground that the defendant did not succeed to the liability of the manufacturer of the lathe, a predecessor corporation also named Litton Industries, Inc. Following a separate hearing, the judge denied the defendant's motion, and judgment entered for McCarthy. We granted the defendant's application for direct appellate review, and we now affirm the judgment of the Superior Court.

We summarize the evidence concerning the accident and the corporate history of the defendant, and we describe the procedural history of this action.

McCarthy was employed at a Raytheon Company facility in Quincy where his responsibilities included the operation of a glass-blowing lathe used in the manufacture of cathode ray tubes. At the time of the accident, McCarthy was "renecking" a glass cathode ray tube. This procedure involves several steps. First, the operator fastens the tube to a glass-working lathe over a gas-fueled burner, heats the neck of the tube, and removes the damaged or defective neck. The operator then fuses a new neck to the tube by heating both pieces over the burner while turning the pieces slowly on the lathe.

Several years prior to the accident, Raytheon modified the lathe on which the accident occurred. The lathe operator var-

ies the intensity of the flame by increasing or decreasing the flow of gas to the burner. At the time the lathe was manufactured, the flow of gas was controlled by foot pedals located at the bottom of the lathe. These pedals were attached to springs so that when the operator removed his foot from the pedal the flow of gas was automatically shut off. Raytheon replaced the spring-loaded pedals, however, with manual valves located at the front of the lathe which did not close automatically.

The accident occurred on August 13, 1980, after McCarthy left the lathe to take a break during the course of renecking a cathode ray tube. Before leaving, McCarthy testified, he closed the hand-operated valves controlling the flow of gas to the burner. Having just removed an unwanted neck, McCarthy left the lower portion of the tube attached to the lathe above the gas burner and the manual valves controlling the flow of gas. Ten or fifteen minutes later, McCarthy returned to his station, opened the valves, and placed an igniter over the burner. The tube exploded, and McCarthy was injured.

We turn now to the corporate history of the defendant and the evidence relevant to the issue of successor liability. The lathe in question was designed, manufactured, and sold by a California corporation called "Litton Industries, Inc." (This corporation will be referred to hereinafter as Litton-California to distinguish it from the present defendant.) The corporation sold the lathe on which the accident occurred in 1948. The sole shareholder in Litton-California was Charles V. Litton. From its incorporation in 1947 until 1952, Litton-California manufactured two products, glass-working lathes and vacuum tubes.

On August 3, 1952, Litton-California transferred assets used in the manufacture of glass-working lathes to a sole proprietorship of Charles V. Litton, which also acquired certain of Litton-California's corporate records and personnel. The sole proprietorship assumed production of Litton-California's glass-working lathe product lines using Litton-California's former plant. On May 1, 1953, Charles V. Litton

incorporated the sole proprietorship as "Litton Engineering Laboratories, Inc." (hereinafter, Engineering), which continues to produce glass-working lathes under that name today.

After August 3, 1952, when it transferred its lathe-manufacturing assets, Litton-California continued to produce vacuum tubes. Fifteen months after the transfer, on November 4, 1953, Charles V. Litton sold his shares in Litton-California to a Delaware corporation called Electro Dynamics Corporation (Electro). In this transaction, Electro acquired all the issued and outstanding capital stock of Litton-California. Charles V. Litton received no shares in Electro, nor did he become an officer, director, or employee of that corporation after the sale. In 1954, Electro discovered that its name was similar to that of another corporation. Electro therefore changed its name to "Litton Industries, Inc.," a Delaware corporation, after acquiring the right to that name from Charles V. Litton. This corporation, still known as "Litton Industries, Inc." (hereinafter, Industries), continues to manufacture electronic components today. Since the equipment transfer on August 3, 1952, however, neither Litton-California, Electro, nor Industries has produced glass-working lathes.

To summarize, Litton-California was in a sense the predecessor of two existing corporations: Engineering, a separate corporation which, before it was incorporated, acquired certain of Litton-California's assets for manufacturing lathes in 1952; and Industries, which, under the name Electro Dynamics Corporation, purchased all the outstanding stock in Litton-California in 1953. The latter, Industries, is the defendant named in this action.

In 1981, McCarthy sued Engineering alleging negligence and breach of warranty. Engineering moved for summary judgment on the ground that it did not manufacture the lathe. In support of its motion, Engineering submitted an affidavit of Charles V. Litton, Jr., the president of the corporation and son of the founder, stating that Engineering had nothing to do with the design, manufacture, advertisement,

or sale of the lathe involved in the accident.[1] Engineering also provided answers to interrogatories to the same effect.

In light of this evidence, McCarthy moved to amend his complaint to substitute Industries as the defendant in place of Engineering. In April of 1984, by agreement of the parties, the judge allowed McCarthy's motion so to amend the complaint and allowed Engineering's motion for summary judgment. McCarthy served Industries with the amended complaint in April, 1985, and the case was called for trial in March, 1988.

At trial, McCarthy proceeded solely on a theory of breach of warranty based on the manufacturer's failure to warn against disconnecting the foot pedals controlling the flow of gas to the burner. In support of his claim, McCarthy called John Orlowski as an expert witness. According to his testimony, Orlowski's qualifications included approximately thirty years of work experience in the design, maintenance, or safety analysis of industrial machinery. Orlowski also had some training (though not a Bachelor's degree) in mechanical engineering, had published in the field, was a member of several relevant professional organizations, and was a licensed professional engineer in Massachusetts and New York. On cross-examination, however, it was revealed that Orlowski had no specific expertise in the design of glass-working lathes and had not even seen such a lathe before being hired to testify.

Over the defendant's objection, the judge qualified Orlowski as an expert and allowed him to offer his opinion as to how the accident occurred. Orlowski stated that most likely McCarthy inadvertently left the gas valve slightly open when

---

[1] The affidavit states in part: "Based upon my personal observation of the [lathe involved in the accident] on June 25, 1982 and the results of the search of the records of Litton Engineering Laboratories, Inc., I can say under oath that this machine . . . was not designed, developed, tested, manufactured, assembled, inspected, marketed, promoted, advertised, or sold or distributed by Litton Engineering Laboratories, Inc. . . . [N]o agent, servant or employee of the Litton Engineering Laboratories, Inc. ever placed the machine in question into the course of trade."

he went on his break, permitting gas to accumulate in the open tube fastened above the burner, which caused an explosion when McCarthy attempted to light the burner. Orlowski further stated that Raytheon's bypassing the foot pedal was foreseeable to the manufacturer, that the manufacturer should have affixed to the lathe a warning against such a modification, and that the modification was "directly responsible for the accident."

The jury returned a verdict for McCarthy. In answers to special questions, the jury found that both McCarthy and Raytheon had misused the lathe. The jury found that Raytheon's misuse was foreseeable to the manufacturer and that McCarthy's misuse, though unforeseeable, was not a proximate cause. Thus, judgment entered in McCarthy's favor.

Industries appeals on four grounds. First, Industries argues that Engineering, and not Industries, is liable for defects in lathes sold by Litton-California.[2] Second, Industries contends that the applicable law is the Uniform Sales Act, G. L. (Ter. Ed.) c. 106, § 17 (2), the commercial statute in effect when the lathe was originally sold in 1948, before the Uniform Commercial Code (UCC) was adopted. The Uniform Sales Act, Industries argues, provides no warranty in cases involving misuse of a product even where the misuse was foreseeable. Third, Industries suggests that McCarthy's misuse bars his recovery under current law. Fourth, and finally, Industries argues that the court erred in qualifying Orlowski as an expert witness. We are not persuaded by these arguments.[3]

---

[2]In his memorandum of law and decision on a motion for judgment notwithstanding the verdict on the issue of successor liability, the judge found that "Litton-California no longer exists [and that] in 1953, all of its outstanding stock was acquired by [Industries] (then named Electro Dynamics Corp.), making Litton-California a subsidiary of [Industries]" and that, as a result, Industries assumed the liabilities of Litton-California. These findings and rulings are not contested.

[3]In addition, McCarthy urges that we exclude all evidence on the issue of successor liability because Industries allegedly concealed such evidence by failing to supplement incorrect responses to discovery requests. McCarthy contends that the defendant's actions constituted a violation of Mass. R. Civ. P. 26 (e) (2), 365 Mass. 772 (1974). Rule 26 (e) (2) imposes a duty to supplement answers to discovery requests when a party subse-

1. *Successor corporate liability.* Industries argues that Engineering succeeded to Litton-California's liability for defective lathes when it purchased assets used in manufacturing lathes from Litton-California in August of 1952.

It is a settled rule of corporate law that, when one company purchases the assets of another, the purchaser does not thereby acquire the debts and liabilities of the seller. *Guzman* v. *MRM/Elgin*, 409 Mass. 563 (1991). *Dayton* v. *Peck, Stow & Wilcox Co. (Pexto)*, 739 F.2d 690, 692 (1st Cir. 1984) (construing Massachusetts law). 15 W. Fletcher, Private Corporations § 7122 at 231 (rev. perm. ed. 1990). The rule is subject to four exceptions: liability may be imposed on the purchasing corporation (1) where the purchaser impliedly or explicitly agrees to assume the liability of the seller, (2) where the transaction is entered into fraudulently to avoid liability, (3) where the transaction amounts to a de facto merger, or (4) where the purchasing corporation is "a mere continuation" of the selling corporation. *Guzman, supra* at 566. *Dayton, supra*. Industries argues that Engineering is a continuation of Litton-California as contemplated by the fourth exception.[4]

The "continuation" exception to the general rule of nonliability, however, envisions a reorganization transforming a

_____

quently obtains information that casts doubt on the truth of those answers. The trial judge denied McCarthy's motion to exclude evidence on the issue of successor liability, however, and we now affirm that decision.

The conduct of discovery is within the sound discretion of the judge. In this context, "we do not interfere with the judge's exercise of discretion in the absence of a showing of prejudicial error resulting from an abuse of discretion." *Solimene* v. *B. Grauel & Co., KG*, 399 Mass. 790, 799 (1987). The plaintiff has not demonstrated such an abuse of discretion in this case.

Moreover, it is not necessary to decide this issue because our holding that Industries is in fact the proper corporate defendant negates any prejudice to McCarthy's case from the decision to admit contrary evidence on this issue.

[4]Industries also argues that Engineering falls within an exception to this rule imposing liability on a buyer that continues to produce the seller's product line. See *Ray* v. *Alad Corp.*, 19 Cal. 3d 22 (1977). We do not address this argument because we have declined to adopt the "product line" exception for products liability cases in Massachusetts. *Guzman* v. *MRM/Elgin, supra* at 567-571.

single company from one corporate entity into another. See 15 W. Fletcher, *supra* at § 7122 n.15, and cases cited. The purchasing corporation, in the words of one court, is merely a "new hat" for the seller. *Bud Antle, Inc.* v. *Eastern Foods, Inc.*, 758 F.2d 1451, 1458 (11th Cir. 1985). Thus, the imposition of liability on the purchaser is justified on the theory that, in substance if not in form, the purchasing corporation is the same company as the selling corporation. The purchaser of corporate assets, therefore, would not be considered to be the alter ego of the seller where the seller continues to exist after the transfer of its assets. *Roy* v. *Bolens Corp.*, 629 F. Supp. 1070, 1072 (D. Mass. 1986). Accord *Schumacher* v. *Richards Shear Co.*, 59 N.Y.2d 239, 245 (1983). Thus, under this theory Engineering is not a "continuation" of Litton-California because Litton-California survived the sale of its lathe-manufacturing assets.

A few courts have adopted a broader "continuity of enterprise" exception to the general rule of successor nonliability in strict liability product defect cases. See generally 15 W. Fletcher, *supra* at § 7123.06. The continuity of enterprise exception is said to be a less radical departure from traditional corporate law rules than the product line theory. *Id.* at 275. Continuity of enterprise analysis does not require that the predecessor and successor corporations have common shareholders, *Polius* v. *Clark Equip. Co.*, 802 F.2d 75, 86 (3d Cir. 1986) (Mansmann, J., concurring and dissenting); *Turner* v. *Bituminous Casualty Co.*, 397 Mich. 406, 429-430 (1976), as does the more traditional continuation exception. *Dayton, supra* at 693, quoting *Leannais* v. *Cincinnati, Inc.*, 565 F.2d 437, 440 (7th Cir. 1977) ("The key element of a 'continuation' is a common identity of the officers, directors and stockholders in the selling and purchasing corporations").[5]

---

[5]"The continuity of enterprise analysis considers four factors: (1) continuity of management, personnel, physical location, and assets; (2) dissolution of the predecessor; (3) assumption of the ordinary business obligations and liabilities by the successor; and (4) the successor's presentation of itself as the continuation of the predecessor." 15 W. Fletcher, Private Corporations § 7123.06 at 275 (rev. perm. ed. 1990).

Even under this broader standard, however, dissolution of the predecessor corporation is required, a requirement not fulfilled here. See *Turner, supra* at 429. We are not, therefore, faced with the issue of the applicability of the "continuity of enterprise" theory in this Commonwealth.[6] Thus, we reaffirm that the indices of a "continuation" are, at a minimum: continuity of directors, officers, and stockholders; and the continued existence of only one corporation after the sale of assets. *Roy* v. *Bolens Corp., supra.* The exception thus defined does not permit imposition of liability on Engineering in this case.

2. *The effect of the Uniform Sales Act.* Industries contends that McCarthy's breach of warranty claim is governed not by the UCC, G. L. c. 106, §§ 2-314 — 2-318 (1988 ed.), but by the Uniform Sales Act, G. L. (Ter. Ed.) c. 106, § 17 (2), because the lathe was sold ten years before the adoption of the UCC in 1958. See St. 1957, c. 765, § 21. Under the Uniform Sales Act, Industries asserts, a lesser warranty of merchantability is implied, and, under that standard, Industries is not liable in this case. We disagree.[7]

---

[6]We note that the "continuity of enterprise" exception in products liability cases remains distinctly a minority approach. At least seven States have declined so to expand the "continuation" exception. See *Niccum* v. *Hydra Tool Corp.*, 438 N.W.2d 96, 99 (Minn. 1989); *Jones* v. *Johnson Mach. & Press Co.*, 211 Neb. 724, 729 (1982); *Schumacher* v. *Richards Shear Co.*, 59 N.Y.2d 239, 245 (1983); *Downtowner, Inc.* v. *Acrometal Prods., Inc.*, 347 N.W.2d 118, 124-125 (N.D. 1984); *Hamaker* v. *Kenwel-Jackson Mach., Inc.*, 387 N.W.2d 515, 519 (S.D. 1986); *Ostrowski* v. *Hydra-Tool Corp.*, 144 Vt. 305, 308 (1984); *Fish* v. *Amsted Indus., Inc.*, 126 Wis. 2d 293, 312 (1985). See also *Polius* v. *Clark Equip. Co.*, 802 F.2d 75, 80 (3d Cir. 1986) (construing law of Virgin Islands which, in this case, is the Restatement [Second] of Torts); *Wallace* v. *Dorsey Trailers Southeast, Inc.*, 849 F.2d 341, 343-344 (8th Cir. 1988) (construing law of Missouri); *Conn* v. *Fales Div. of Mathewson Corp.*, 835 F.2d 145, 147 (6th Cir. 1987) (construing law of Kentucky).

[7]We note that the United States Court of Appeals for the First Circuit, construing Massachusetts law, recently concluded that the Uniform Sales Act does not imply a less demanding warranty of merchantability in this situation. *Venturelli* v. *Cincinnati, Inc.*, 850 F.2d 825, 828-829 (1st Cir. 1988).

The Uniform Sales Act provided, in relevant part: "Where the goods are bought by description from a seller who deals in goods of that description . . . there is an implied warranty that they shall be of merchantable quality." G. L. (Ter. Ed.) c. 106, § 17 (2), repealed by St. 1957, c. 765, § 1. The UCC imposes an implied warranty that goods "are fit for the ordinary purposes for which such goods are used." G. L. c. 106, § 2-314 (2) (*c*).

Industries claims two distinctions exist between the implied warranties of merchantability imposed under the Uniform Sales Act and under the UCC. First, Industries suggests that there is no recovery for breach of warranty under § 17 (2) of the Uniform Sales Act for injuries caused by product misuse. See *Casagrande* v. *F.W. Woolworth Co.*, 340 Mass. 552, 555 (1960) (Uniform Sales Act requires that goods be fit for ordinary use "when used in accordance with adequate warning and instructions"). Assuming, without deciding, that this is so, we nevertheless conclude that Industries is liable in this case because the jury found that McCarthy's misuse of the lathe was not a proximate cause of the accident. Industries points to no case under § 17 (2) of the Uniform Sales Act in which a plaintiff's misuse of a product barred recovery where the misuse was not causally related to the accident. To the contrary, every case Industries cites involves a product misuse that directly caused injury. See, e.g., *Taylor* v. *Jacobson*, 336 Mass. 709, 718 (1958) (no breach of warranty where plaintiff failed to conduct "patch test" as instructed before applying hair dye which burned her); *Vincent* v. *Nicholas E. Tsiknas Co.*, 337 Mass. 726, 729 (1958) (no breach of warranty where plaintiff's "inappropriate" use of a bottle opener to open a jar caused it to shatter).

Second, Industries argues that § 17 (2) of the Uniform Sales Act imposed a more forgiving standard of "merchantability" than does the UCC. Industries points to a line of cases construing the warranty of merchantability implied under the Uniform Sales Act as a warranty only of identity, not of quality. At one time the court opined: "This is not a warranty of quality. It does not require any particular grade.

It is a requirement of identity between the thing which is described as the subject of the trade and the thing proffered in performance of it." *Inter-State Grocer Co.* v. *George William Bentley Co.*, 214 Mass. 227, 231 (1913). Accord *Sokoloski* v. *Splann*, 311 Mass. 203, 206 (1942); *Botti* v. *Venice Grocery Co.*, 309 Mass. 450, 455 (1941); *Parker* v. *Shaghalian & Co.*, 244 Mass. 19, 21 (1923).

In a subsequent series of cases, however, the court held that the warranty of merchantability imposed by the Uniform Sales Act was in fact a standard of quality. In these cases, the court construed § 17 (2) of the Uniform Sales Act to impose a warranty that "goods shall be reasonably suitable for the ordinary uses for which goods of that kind and description are sold." *Mead* v. *Coca Cola Bottling Co.*, 329 Mass. 440, 442 (1952). See *Vincent* v. *Nicholas E. Tsiknas Co.*, *supra*; *Taylor* v. *Jacobson*, *supra* at 713; *McCabe* v. *Liggett Drug Co.*, 330 Mass. 177, 179 (1953). These cases effectively overruled the definition of the warranty as an assurance only of identity, replacing it with the "suitable for the ordinary uses" definition.

Industries implicitly argues that we should apply the judicial interpretation of the Uniform Sales Act as it existed in 1948, when Industries' predecessor sold the lathe, rather than applying subsequent changes in the case law retroactively. This argument would eliminate consideration of *Mead*, *supra*, and the cases following it.

It should be noted at the outset that *Mead*, which was decided in 1952, applied the suitable for ordinary use standard to an accident that occurred in 1949. There is serious doubt, therefore, that the identity standard was in effect when the sale took place in 1948. Furthermore, "the general rule is in favor of retroactive application of a change in decisional law." *Payton* v. *Abbott Labs*, 386 Mass. 540, 565 (1982). While we have given judicial changes in contract and property law only prospective effect, we have done so because of the element of reliance. *Id.* "[O]nly where the discarded rule afforded complete immunity from suit to a large class of defendants has the court indicated that prospective application

of a new rule would be warranted," *id.* at 567, because such blanket immunity might lead litigants not to obtain tort liability insurance. *Id.* at 566-569. These principles govern in this instance, because an action for breach of the implied warranty of merchantability sounds in tort, not contract. *Dighton* v. *Federal Pac. Elec. Co.*, 399 Mass. 687, 691 n.6 (1987), and cases cited.

In this case it is unlikely that Litton-California, Industries' predecessor, relied on the state of the law in Massachusetts in 1948 in selling the lathe or that Industries so relied in acquiring Litton-California. Retroactive application of the *Mead* court's definition of the warranty of merchantability, therefore, will not defeat any reasonable expectation or reliance. We conclude, in accordance with the general rule, that the *Mead* court's "suitable for the ordinary uses" definition of the warranty should be applied retroactively (as the *Mead* court itself applied it). See *Diaz* v. *Eli Lilly & Co.*, 364 Mass. 153, 167 & n.46 (1973).

Thus, Industries' invocation of the Uniform Sales Act does not affect the result in this case. The UCC warranty of merchantability closely tracks the language of *Mead*, *supra*, and the cases following it in requiring that goods be "fit for the ordinary purposes for which such goods are used." G. L. c. 106, § 2-314 (2) (*c*). We conclude, therefore, that the implied warranty of merchantability of the Uniform Sales Act imposed the same requirements as does the warranty imposed by G. L. c. 106, § 2-314 (2) (*c*).

3. *The plaintiff's misuse.* Industries next contends that McCarthy's breach of warranty claim fails under the UCC because he misused the lathe in a manner unforeseeable to the manufacturer. Under the UCC, however, for the plaintiff's misuse to bar recovery, it must be causally related to the injury. See *Correia* v. *Firestone Tire & Rubber Co.*, 388 Mass. 342, 356 (1983).[8] In this case the jury found that Mc-

---

[8]"[T]he user's negligence does not prevent recovery except when he unreasonably uses a product that he knows to be defective and dangerous. In such circumstances, the user's conduct alone is the proximate cause of his injuries, as a matter of law, and recovery is appropriately denied. In short,

Carthy's misuse was not a proximate cause of the accident. That misuse, therefore, does not prevent McCarthy from recovering.

4. *Qualification of the expert witness.* Finally, Industries contends that the judge erred in qualifying Orlowski to testify as an expert witness because Orlowski was not sufficiently familiar with glass-working lathes. "We have repeatedly stated that the question of an expert's qualifications is for the trial judge, and his determination will be reversed only on an abuse of discretion or error as matter of law. . . . The criterion of the judge is whether the witness possesses sufficient skill, knowledge or experience in the field of his testimony that the jury may receive appreciable assistance from it." (Citations omitted.) *Commonwealth* v. *Boyd*, 367 Mass. 169, 182 (1975). In light of Orlowski's extensive experience in the safety analysis, design, and maintenance of industrial machinery, we conclude that the judge did not abuse his discretion in qualifying this witness.

We see no basis for Industries's claim that Orlowski's testimony as to the source of the gas leak was speculative and therefore without probative value. Cf. *Goffredo* v. *Mercedes-Benz Truck Co.*, 402 Mass. 97, 103-104 (1988).

*Judgment affirmed.*

---

the user is denied recovery, not because of his contributory negligence or his assumption of the risk but rather because his conduct is the proximate cause of his injuries." *Correia* v. *Firestone Tire & Rubber Co., supra.*