Fremont-Smith, J.
Plaintiff Charles A. Hubbard, Inc., d/b/a Allied Adjustment Service (“Allied”) has brought this action for damages alleging that defendant United States Trust Co. (“US Trust”) and its predecessor Home Owners Savings Bank FSB (“Home Owners”) wrongfully deposited checks payable to Allied on which the endorsement was forged, into a bank account which was wrongfully opened by the endorser, resulting in conversion of plaintiffs funds in violation of Mass. G.L.c. 106, §3-419. Allied now moves for partial summary judgment for the alleged violations of Mass. G.L.c. 106, §3-419 which occurred subsequent to when US Trust acquired the assets of Home Owners which had originally opened the bank account.
In response to Allied’s motion for partial summary judgment, US Trust has denied that the indorsements in question were unauthorized and has itself moved for summary judgment on all counts of the plaintiffs complaint. In the alternative, US Trust has moved for partial summary judgment on the ground that on the undisputed facts it is not liable for any wrongful actions of its predecessor, Home Owners.
A hearing was held on March 17, 1994, and, for the reasons stated below, plaintiffs motion is DENIED and defendant’s motions are ALLOWED.
The following facts are undisputed:
Charles A. Hubbard, Inc. (“Allied”) is a Massachusetts corporation engaged in the insurance claims adjustment business. During the relevant period, Hubbard did business under the trade names “Allied Recovery Service,” “Allied Management Service,” and “Allied Adjustment Service.” Allied Adjustment Service was itself neither incorporated nor registered with the Massachusetts Division of Insurance or a registered d/b/a for Hubbard, Inc.
Linda Marchi (“Marchi”) was employed by Allied from October 1987 until September 1992, when (after her embezzlement was discovered) she committed suicide. From 1988 to 1992, Marchi was the Accounts Receivable Manager for Allied and from 1989 until 1992, she was also the manager of its subrogation department.
Not only was Marchi one of only four people authorized to open the mail sacks but she was responsible for entering all checks into the accounting system and for endorsing Allied checks for deposit. She did this by stamping them “For Deposit Only” with an Allied rubber stamp to which she had access.[1] During the course of her employment, she also assisted the president of Allied (Charles A. Hubbard) in the opening and closing of two different accounts, she was herself a signatory on several accounts and was authorized to write checks of up to $15,000 on one account and without any dollar limit on another.
As head of the accounts receivable department, Marchi was responsible for entering all incoming checks on the accounts receivable system, keeping records as to aging receivables, and for writing-off receivables each month (with no limit, from and after 1990, as to the amount that she could write off). In addition, her responsibilities included the supervision of the accounts receivable clerical staff, the entering of the resolution or payment of a subrogation claim onto the computer, the decision as to when a subro-gation claim was “non-recoverable” and the approval of all information going into the data base regarding settlement and recovery. Also, as manager of the subrogation department, Marchi was authorized, inter alia, without any one else’s approval, to close subro-gation flies, to remit subrogation checks for pending matters, and to adjust payments on the computer system.
During the relevant time period Allied was never independently audited. When several of Allied’s customers undertook “spot check” audits, Marchi was the only person designated to provide assistance to them or to answer their questions. Accordingly, Marchi was able to explain any discrepancies and to tailor her scheme as necessary to avoid detection.
*96 On September 21, 1988, Linda Marchi opened an account at Home Owners in the name of “Linda Marchi d/b/a Allied Adjustment,” and began to endorse and deposit Allied checks therein. At that time, Home Owners’ procedure for opening a personal checking account was the same as its procedure for opening an individual’s d/b/a account, since both were regarded as personal (i.e. non-corporate) accounts. For a d/b/a account, no d/b/a certificate or corporate resolution was requested, but only a completed signature card, two forms of personal identification, and a social security number. The bank also called the National Check Protection Service to see whether it had any information on a customer. Once an account was opened, the individual branch was responsible for maintaining the signature card and a copy was sent to Home Owners’ central files.
When US Trust purchased certain of Home Owners’ assets in September 1990, including March’s d/b/a Allied account, Marchi had been a long-time Home Owners customer in good standing, had maintained several accounts at its Newton Centre branch, and was well-known to the branch employees. There had been no irregularities that put Home Owners on notice of anything amiss regarding her account.
Finally, in September 1992, Allied noticed a can-celled accounts receivable check which reflected Marchi’s deposit into the d/b/a account, and became suspicious.[2] Upon confronting Marchi, she confessed that she had been stealing checks for four years.
As was then learned and is now undisputed, after taking accounts receivable checks from the mail sack, Marchi would neglect to enter them into the accounting system at Allied. Later Marchi would apply new incoming checks to the old receivables, thereby continuously stealing checks while manipulating the accounts receivable to cover her tracks. Since Allied had never segregated the tasks of opening the mail, “logging-in” the checks, depositing them and entering payments into the company books and records, Marchi’s actions could not be detected on Allied’s books.
Another method employed by Marchi to conceal her thefts was to simply write-off a certain amount of receivables each month as uncollectible. Since she was authorized, at her own unsupervised discretion, to determine which accounts receivable were uncol-lectible and to be “written off,” she was thus able to account for some of the money she stole. Marchi had similar schemes with respect to her theft of subrogation checks.
After Home Owners became insolvent, Resolution Trust Corporation was appointed Receiver, and on September 7, 1990, entered into an agreement with US Trust (the “Agreement”). The Agreement provided for US Trust’s assumption of specified liabilities of Home Owners, and “none other,” and the assumption of only specified liabilities that were certified by the RTC on or prior to September 7, 1990. No liability for the conduct of Home Owners in opening or administering its customer accounts was specified, and assumed liabilities did not include any liability arising out of Home Owner’s violations of Mass. G.L.c. 106, §3-419 or for any other wrongful conduct of Homeowners of the type alleged here.
After the Agreement, US Trust proceeded to implement its own banking policies, procedures, and business operation in managing the newly acquired Home Owners’ assets. None of the Home Owners’ directors or officers with lending authority became directors or officers of US Trust. Nor did US Trust take over the physical space where the main headquarters of Home Owners had been located, but continued to operate the newly-acquired assets from its own previously-established headquarters. While US Trust did take over the facilities at Home Owners’ former Framingham branch, it acquired the leases or purchased outright only certain branches. US Trust’s business, moreover, differed in fundamental ways from Home Owners’, US Trust being a commercial bank, whereas Home Owners had been a savings bank, so that they were operated under different governmental regulations and offered different banking services.
DISCUSSION
I. US Trust’s Liability for Acts or Omissions of Home Owners
Summary judgment shall be granted where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the moving party is entitled to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). Where both parties have moved for summary judgment and “in essence there is no real dispute as to the salient facts or if only a question of law is involved,” summary judgment shall be granted to the party entitled to judgment as a matter of law. Cassesso, supra.
Allied first argues that, because an earlier motion of US Trust to dismiss was denied, its motion for partial summary judgment should be denied based on the “law of the case.” However, “law of the case” does not apply, as the court employs an entirely legal different standard when deciding a motion to dismiss as opposed to a motion for summary judgment.
It is well settled in Massachusetts that, “when one company purchases the assets of another, the purchaser does not thereby acquire the debts and liabilities of the seller,” except “(1) where the purchaser impliedly or explicitly agrees to assume the liability of the seller, (2) where the transaction is entered into *97 fraudulently to avoid liability, (3) where the transaction amounts to a de facto merger, or (4) where the purchasing corporation is ‘a mere continuation’ of the selling corporation.” McCarthy v. Litton Industries, Inc., 410 Mass. 15, 21 (1991).
Allied concedes that none of the first three exceptions are applicable, but argues that US Trust is “a mere continuation” of Home Owners.
“The ‘continuation’ exception to the general rule of nonliability . . . envisions a reorganization transforming a single company from one corporate entity into another,” and is applicable where the “purchasing corporation ... is merely a new hat for the seller [and] the imposition of liability on the purchaser is justified on the theory that, in substance if not in form, the purchasing corporation is the same as the selling corporation.” Id., at 22.
The undisputed facts indicate, however, that US Trust is not in form or substance the same organization or “a mere continuation” of or a “new hat” for Home Owners. Not only is the nature of US Trust’s business different from Home Owners (US Trust being a commercial bank, whereas Home Owners was a savings bank), but there was indisputably no “common identity of officers, directors and shareholders” between the two banks, even under the broader definition of “continuity of enterprise” discussed in McCarthy, supra, id., 22-23. While US Trust did hire some former Home Owners employees, and did continue some of its branches, including the branch where the d/b/a account was located, it did not hire other of Home Owners employees, have a “common identity of officers, directors and shareholders,” or continue all of its branches. Indeed, US Trust continued to use its own headquarters location rather than take over Home Owners’. Thus, no material facts are alleged sufficient to enable a jury to reasonably conclude that US Trust became a “mere continuation” of Home Owners, and US Trust’s potential exposure in this case must be limited to its own management of the d/b/a account in the period subsequent to September 1990.[3]
II. US Trust’s Liabiliiy For Marchi’s Conversion
The issue remains whether US Trust may be liable for conversion pursuant to Mass. G.L.c. 106, §3-419, during the period that it managed the d/b/a account, i.e. subsequent to September 1990.
Mass. G.L.c. 106, §3-419 states in pertinent part, that “(1) An instrument is converted when . . . (c) it is paid on a forged indorsement.” The question, then, is whether Marchi’s stamped endorsements of Allied checks and their deposit into her d/b/a account constituted “forgery.”
An “unauthorized signature or indorsement means one made without actual, implied or apparent authority and includes a forgery.” Mass. G.L.c. 106, §1-201(43). As there are no facts indicating “apparent authority,” there being no evidence that Marchi held herself out as an agent of anybody other than herself, Commercial Credit Corp. v. Stan Cross Buick, Inc., 343 Mass. 622, 626 (1962), the issue is one of actual or implied authority.
The power to indorse checks may be likened to the power to execute promissory notes, which is viewed as “unusual and extraordinary authority [which is] fraught with great possibilities of financial calamity,” so that it should “not lightly be implied [and] either must be granted by express terms or flow as a necessary and inevitable consequence from the nature of the agency actually created ...” Williams v. Dugan, 217 Mass. 526, 527 (1914). It is, however, undisputed here that Marchi was given express, actual authority from Allied to indorse the checks in question. Allied argues, however, that it was understood that she was authorized to endorse checks for deposit only into Allied accounts, and not into her personal account, so that her endorsements were, in that sense, unauthorized and hence forgeries, rendering US liable.
Although no Massachusetts case has decided the question on similar facts, the precise issue was decided on similar facts in Jones v. Van Norman, 522 A.2d 503, 507 (Pa. 1987). There, the court held that a check was not “forged” for purposes of the Uniform Commercial Code where a person who was authorized to endorse checks “in blank” subsequently deposited them into the endorser’s personal account. Here, as in Jones, while it is clear that the misappropriation by depositing the checks into the endorser’s personal account was unauthorized, the misappropriation did not, in this court’s view, transform the prior authorized indorsements into “forgeries.” As stated in Jones, “[t]he signing of the payee-principal’s name on the check is either authorized or it is not. That status does not depend upon whether the authorized representative properly applies the checks to the account of the payee or misapplies them to his own use.” Id.
In its brief, Allied cites a number of cases from other jurisdictions in which a bank was held liable for unauthorized endorsements. For instance, cases are cited where a defendant’s endorsement was found to be unauthorized because the endorser’s authority had been expressly restricted to depositing checks into a specific corporate, rather than a non-corporate, account. Here, however, Marchi was authorized to deposit checks into a number of non-corporate, “d/b/a Allied” accounts, and was, in effect, authorized to endorse Allied’s name “in blank.” As in Jones, when Allied authorized Marchi to indorse and deposit its checks “in blank,” and the bank had no knowledge of any limiting instructions to Marchi, Allied should, in the Court’s view, be viewed as having “assumed the risk of her competence and honesty” and not be permitted to place such risk on a depository bank *98 which had not even opened the unauthorized d/b/a account. For US Trust to be found liable by a jury for conversion pursuant to §3-419, there would have to be facts upon which the jury could conclude that Marchi’s endorsements were “unauthorized” within the meaning of the statute. Here, the material facts are undisputed so that a pure question of statutory interpretation is presented. In these circumstances, it seems appropriate that the court, rather than a jury, should perform the legal function of construing §3-419 on these undisputed facts. In the Court’s view, Marchi’s indorsements of the checks which she deposited into her d/b/a Allied Adjustment account at US Trust were, in the particular circumstances here, “authorized” within the meaning of §3-419 as a matter of law, so that US Trust committed no conversion of Allied’s property.[4]
ORDER
For the reasons set forth above, it is hereby ORDERED that defendant’s motions for summary judgment and partial summary judgment are ALLOWED, and plaintiffs motion for summary judgment is DENIED. Judgment shall enter for the defendant on all counts.

 It was the practice at Allied that all checks would be endorsed by stamp rather than by handwriting, and then deposited into Allied’s various bank accounts, none of which were located at Home Owners or US Trust.

 Although Allied’s bookkeeper, two years prior to Marchi’s confession, had noticed a variety of “errors” in Hubbard’s accounts and had reported her concern to Charles Hubbard and to others on at least six occasions, no investigation had been undertaken and no safeguards were put in place by Allied.

 The Court thus finds it unnecessary to consider so much of US Trust’s motion which concerns the statute of limitations, or to consider US Trust’s motion to strike that portion of Charles A. Hubbard’s affidavit which contains the statement: “Marchi had no authority to use the name ‘Allied Adjustment,’ to open a bank account, or otherwise and the DBA was not an authorized depository for Allied Funds.” Whether Home Owners wrongfully permitted Marchi to originally open the account in her personal name d/b/a Allied Adjustment in September 1988, is not germane to US Trust’s liability.

 It is thus unnecessary for the court to reach the further questions which would be raised if Marchi’s indorsements were held to constitute forgeries, i.e. whether US Trust is legally entitled to assert, as a defense, that it acted in good faith and in accordance with reasonable commercial standards, G.L.c. 106, §3-419(3); First National Bank of Boston v. Harvey, 10 Mass.App.Ct. 715 (1980), and, if so, whether Allied’s own negligence contributed to its injury. G.L.c. 106, §3-406.