**MOTORSPORT ENGINEERING, INC., d/b/a Majestic Cars, Ltd., Plaintiff,**

v.

**MASERATI, S.P.A., and Maserati North America, Inc., Defendants.**

**Ferrari, S.P.A., Intervenor and Plaintiff–in–Counterclaim,**

v.

**Motorsport Engineering, Inc., d/b/a Majestic Cars, Ltd., Defendant–in–Counterclaim.**

**No. 00–CV–11208–MEL.**

United States District Court, D. Massachusetts.

Dec. 14, 2001.

phasis added).

Louis Cassis, Quincy, MA, for plaintiff.

Jason Isralowitz, Carl J. Chiappa, Sarah C. Kellog, Charles J. Dyer, Kirkpatrick & Lockhart, New York City, for defendant.

Joel Bernstein, Solomon & Bernstein, New York City, Charles J. Dyer, Kirkpatrick & Lockhart, for movant.

## MEMORANDUM AND ORDER

LASKER, District Judge.

Motorsport Engineering, Inc., d/b/a Majestic Cars, Ltd. ("Majestic"), brings this suit against Maserati, S.p.A. ("Maserati II"), and Maserati North America, Inc. ("MNA"), alleging that it has been wrongfully deprived of its dealership selling new Maserati automobiles. Majestic successfully sold Maserati automobiles in Massachusetts during the late 1980s, but ceased to operate as a new car dealership when new Maserati automobiles were withdrawn from the North American market at the end of 1989. Maserati II intends to reintroduce the Maserati product line in the United States, but does not wish to employ Majestic as a dealer. Instead, it seeks to use existing Ferrari automobile dealerships. Majestic alleges that in connection with the withdrawal from and proposed reentry into the North American

market, Maserati II and MNA violated the Automobile Dealers Day in Court Act, 15 U.S.C. § 1221, and the comparable Massachusetts statute, M.G.L. ch. 93B, breached their contractual obligations, and violated the Massachusetts Consumer Protection Statute, M.G.L. ch. 93A.

Because of its interests in these matters, Ferrari, S.p.A. ("Ferrari") has intervened pursuant to Fed.R.Civ.P. 24 and asserted a counterclaim for trademark infringement against Majestic.

Both sides move for summary judgment. Majestic's motion is denied. Maserati II's, MNA's, and Ferrari's motion is granted.

## I.

Majestic is an automobile dealer in Cohasset, Massachusetts, that entered into a "Standard Dealer Agreement" with Maserati Automobiles, Inc. ("MAI") in 1986 and again in April, 1989. MAI was the North American importer and distributor of Maserati cars and Officine Alfieri Maserati, S.p.A. ("OAM") was the manufacturer of Maserati automobiles at that time. A third corporation, DeTomaso Industries, Inc. ("DTI"), wholly owned MAI and owned 84% of OAM.

Maserati automobiles sales in the United States were not profitable for OAM during the late 1980s, in part because of the low quality of the cars themselves, which, due to strong lemon laws and stringent safety and emissions requirements in the United States, increased expenses. In response to this situation, in November, 1989, OAM, DTI, and Alejandro DeTomaso (the owner of DTI) entered into an agreement with Fiat Auto, S.p.A. ("Fiat Auto"), the automobile subsidiary of Fiat, S.p.A. ("Fiat"), the result of which was that OAM contributed all of its Maserati assets to a new corporation named Maserati, S.r.l. ("Maserati I"), in exchange for an infusion of $105 million in capital. OAM held 51% of

the Maserati I stock, and Fiat Auto held 49%. On December 31, 1989, OAM ceased, and Maserati I began, manufacturing all Maserati automobiles.

On the same day, Maserati I ceased all new car sales in North America. There was no formal announcement of this significant change in policy.

MAI sent two letters to dealers in North America (including Majestic) in January, 1990. MAI reported that it was "not directly involved with the Fiat/Maserati negotiations ..., [would] continue its distribution in North America as usual," and that a new car called the "Shamal" might be introduced in the Summer of 1990. *Am. Compl.* Ex A. In February, 1990, DTI issued a press release describing the financial terms of the agreement between OAM and Fiat Auto. The Shamal was never introduced in the United States, but OAM continued to sell Maserati automobile parts to MAI, which in turn supplied the various shops, like Majestic, that bought them to service the Maserati cars still operating in the United States.

In May, 1993, Fiat Auto bought OAM's 51% share of Maserati I.

In December, 1994, MAI closed its operations and sold its remaining parts inventory.

In June, 1997, Maserati I contributed all of its stock to another corporation, Futuradicitto, which changed its name to Maserati S.p.A. (again, "Maserati II"). Maserati II was owned 50% by Ferrari, which itself was 87% owned by Fiat, and 50% by Fiat's subsidiary, Fiat Auto.

In November, 1999, Ferrari bought out Fiat Auto's 50% share of Maserati II. The end result was that Ferrari owned Maserati II completely.

Ferrari and Maserati II now seek to reintroduce Maserati cars in the North

American market, and want to do so through existing Ferrari dealerships. The ownership structure in Ferrari is that Ferrari owns 100% of Ferrari International, which owns 100% of Ferrari North America ("FNA"), which owns 100% of Maserati North America (again, "MNA"). Therefore, MNA will distribute the new Maserati automobiles in North America. Ferrari, Maserati II, and MNA do not believe they have any existing relationship with Majestic that would require them to sell Maserati brand cars to Majestic. Majestic sues for breach of the Standard Dealers Agreement it signed with MAI in 1986 and again in 1989 as well as for violations of the Automobile Dealers Day in Court Act, 15 U.S.C. § 1221, and M.G.L. chs. 93A and 93B.

Since 1990, Majestic has converted itself, by necessity, into a used car dealership, although it continues to hold itself out as a Maserati dealer and displays the Maserati name prominently at its business. Ferrari owns the rights to two registered marks relating to Maserati: (1) U.S. Reg. No. 933,481, registered May 9, 1972, relating to the Maserati name and design associated with the automobiles; and, (2) U.S. Reg. No. 1,544,327, registered June 20, 1989, again related to the Maserati name and the parts and structure of the automobiles. Ferrari obtained the rights to these marks by assignment from the company formerly known as Maserati I. Because Ferrari has no agreement with Majestic to allow Majestic to use the marks, Ferrari seeks, in its trademark infringement counterclaim, to enjoin Majestic from continuing to do so. On April 11, 2000, Ferrari sent a cease-and-desist letter to Majestic, demanding that Majestic stop what it deemed infringing activity or face a lawsuit designed to enforce Ferrari's trademark rights. In response, Majestic commenced this suit in July, 2000.

## II. Successor Liability

The parties agree that Majestic can be granted relief only if Maserati II and MNA are found to have assumed, despite the many corporate transactions described above, the liabilities that MAI created by contracting with Majestic in 1986 and 1989. The parties do not agree, however, about what law regarding successor liability applies in this instance.[1] Maserati II and MNA contend that Italian law governs the issue; Majestic asserts that Massachusetts law controls.

There is no need to apply Italian law, which is undisputedly stricter than Massachusetts law on the issue of successor liability,[2] as, for reasons stated below, even

---

1. In diversity, federal district courts apply the choice of law rules of the state in which they sit; here, Massachusetts. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Massachusetts has adopted a "functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole." *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 631, 473 N.E.2d 662, 668 (1985); *Shinberg v. Bruk*, 875 F.2d 973, 975 (1st Cir.1989). This matter is before this court through both diversity and federal question jurisdiction.

2. Under Italian law, Maserati II and MNA contend that Fiat employed a "contribution" or "spin-off" under Article 2343 of the Italian Civil Code. They offer the affidavit of Giovanni Iudica, a professor of private law and a lecturer on civil law at Bocconi University in Milan, Italy. He opines that under Italian law the parties excluded the OAM–MAI relationship from "succession in any manner." 2 *App. in Supp. of Defs.' and Intervenor's Mot. for Summ. J.* Ex. F.B at 12.

Majestic acknowledges that the "contribution" or "spin off" in Italian law "sounds exactly like the universally accepted American doctrine that a receiving company does not inherit the liabilities of a transferring company on the sale of assets." *Majestic's Mem. of Law in Opp'n to Maserati's Mot. for Summ. J.*

under the more forgiving American standards, Majestic has not established successor liability.

The corporate transactions can be best analyzed when separated into three parts: (1) the relationship between MAI and OAM; (2) the creation of Maserati I; and (3) the creation of Maserati II. These three steps form a chain that must flow in order, from link to link, without being broken if Majestic is to assert a successful claim.

### A. The Relationship Between MAI and OAM

In the 1980s, MAI was the North American importer and distributor of Maserati cars manufactured by OAM in Italy. During the relevant time period, DTI wholly owned MAI and owned 84% of OAM. In turn, Alejandro DeTomaso owned 80% of DTI.

Majestic concludes that this ownership structure passed on to OAM the liabilities MAI accrued when it entered into Standard Dealer Agreements with Majestic in 1986 and 1989. Majestic contends that MAI was either the agent of OAM, since DeTomaso controlled both corporations and MAI would have had no business without OAM's vehicles to distribute, or that OAM was the third-party beneficiary of MAI's dealings.[3] Either way, Majestic asserts that the liabilities arising from the agreements between MAI and Majestic should be imputed to OAM.

Maserati II and MNA respond that Majestic has provided no basis to find that OAM was the franchisor under the Majestic–MAI Standard Dealer Agreements.

Maserati II and MNA start their critique by pointing out that all dealings, the 1986 and the 1989 contracts, were between Majestic and MAI, not Majestic and OAM. And while DTI owned both MAI (100%) and OAM (84%), this fact is insufficient, according to Maserati II and MNA, to establish that OAM is liable under the agreements signed between MAI and Majestic. Because Massachusetts courts rarely disregard corporate separateness, *Dale v. H.B. Smith Co., Inc.*, 910 F.Supp. 14, 18 (D.Mass.1995), Maserati II and MNA contend that sibling corporations, as MAI and OAM were, are not liable for each other's debts.

Maserati II and MNA also contend that MAI was not the agent of OAM. As a starting point, both the 1986 and the 1989 agreements entered into by Majestic were between Majestic and MAI—not OAM. Moreover, Maserati II and MNA note that Majestic only contacted OAM twice before the initiation of this lawsuit, once for a technical matter, and once for a warranty audit issue. Maserati II and MNA further argue that there has been no showing that OAM was involved in dealer operations/relations. Without such a showing, Maserati II and MNA contend that two sibling corporations with a common shareholder should not be held to be agents of one another.

Nor can OAM be bound by MAI's liabilities as a third-party beneficiary, according to Maserati II and MNA. For this proposition, Maserati II and MNA rely on Professor E. Allan Farnsworth, who writes: "the

---

at 25. Majestic argues, correctly, that courts in the United States have carved out exceptions to this rule (e.g., de facto merger, mere continuation of predecessor). However, to the extent that Italian law does not recognize these exceptions, Majestic contends that American courts should not "give credit to a stilted view of asset transfers that will work

obvious inequity." *Majestic's Mem. of Law in Opp'n to Maserati's Mot. for Summ. J.* at 25.

**3.** Both the 1986 and 1989 agreements expressly state that OAM is a third-party beneficiary. *See Aff. of Louis A. Cassis in Supp. of Pl.'s Mot. for Summ. J.*, Exs. A at ¶ 3, B at ¶ 4.

beneficiary is subject to recoupment of any claims of the promisor for damages for breach of contract by the promisee. The claim is only good against the beneficiary to the extent that it extinguishes the beneficiary's claim; *it cannot be used to impose liability on the beneficiary.*" III *Farnsworth on Contracts,* § 10.9 at 53–54 (2d ed.1998) (emphasis added). Maserati II and MNA contend that to hold a third-party liable for the debts of a breaching promisee would turn contract law on its head.

As a general matter, Massachusetts law holds that sibling corporations do not share their liabilities absent unusual circumstances, even when owned by a holding company. Corporations that share owners and even management are not automatically held to share liabilities. Rather, only

> additional facts ... permit the conclusion that an agency or similar relationship exists between the entities. Particularly is this true (a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting.

*My Bread Baking Co. v. Cumberland Farms, Inc.,* 353 Mass. 614, 619, 233 N.E.2d 748, 751–52 (1968); *see also American Home Assur. Co. v. Sport Maska, Inc.,* 808 F.Supp. 67, 73 (D.Mass.1992). There are no such circumstances here, and

therefore the liabilities MAI accrued when it entered into contracts with Majestic in 1986 and 1989 cannot be attributed to OAM.

First, although DTI did own both MAI (100%) and OAM (84%) in the late 1980s, and even though DTI was largely owned by Alejandro DeTomaso (80%), as noted above, these facts alone are not enough to disregard the corporate separateness of the two corporations. *My Bread Baking Co.,* 353 Mass. at 619, 233 N.E.2d at 751–52; *Miller v. Honda Motor Co., Ltd.,* 779 F.2d 769, 772 (1st Cir.1985) (holding common officers between corporations are not enough to disregard corporate separateness).

Therefore, something more is needed, but is not present, in the record. Majestic has provided no evidence of "active and direct participation by the representatives of [OAM], apparently exercising some form of pervasive control, in the activities of [MAI]." *My Bread Baking Co.,* 353 Mass. at 619, 233 N.E.2d at 751–52. At most, Majestic merely implies that the commonality of the ownership must logically constitute such control. Majestic does point out that MAI did not have a written contract with OAM, inferring an informal situation in which Alejandro DeTomaso controlled both corporations. But Majestic only twice directly interacted with OAM prior to 1990: once for a technical problem regarding an oil leak and once on a warranty issue. 1 *App. in Supp. of Defs.' and Intervenor's Mot. for Summ. J.* Ex. A.2 at 22 and 36–37 (Dep. of Luigi Masciarelli). Further, when Majestic sent a letter directly to Alejandro DeTomaso, OAM sent a reply letter stating that for matters in the United States, Majestic should contact MAI. *Am. Compl.* Ex A.; *Aff. of Cassis,* Ex. L at 162–65 (Dep. of Luigi Masciarelli). This level of involvement falls far short of the "pervasive con-

trol" required in Massachusetts to disregard corporate separateness. Moreover, there has been no showing of "some fraudulent or injurious consequence of the intercorporate relationship." *My Bread Baking Co.*, 353 Mass. at 619, 233 N.E.2d at 751–52. Majestic may well have been injured by the withdrawal of Maserati from North America, but it was not injured as a result of OAM intermingling its relations with MAI, nor has there been any showing of fraudulent behavior.

For the same reasons, Majestic has not established a "confused intermingling of activity [by MAI, OAM, and DTI in] substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting." *My Bread Baking Co.*, 353 Mass. at 619, 233 N.E.2d at 751–52. OAM purposefully kept its corporate identity separate from MAI, as shown particularly clearly with the February 24, 1989 letter instructing Majestic to write to MAI, not OAM, for matters involving North American market distribution. *Am. Compl.* Ex A.; *Aff. of Cassis*, Ex. L at 162–65 (Dep. of Luigi Masciarelli). The Standard Dealer Agreements of 1986 and 1989 are clear that the contracting parties are MAI and Majestic; a representative of OAM did not sign either contract. In sum, MAI and OAM acted permissibly when operating closely together but as two separate entities. "[T]here is nothing fraudulent or against public policy in limiting one's liability by the appropriate use of corporate insulation." *Miller*, 779 F.2d at 773.

As a result, none of Majestic's claims succeed against Maserati II or MNA. Both Maserati II and MNA are connected only to OAM, and not MAI.[4] Accordingly, summary judgment is denied as to Majestic and granted for Maserati II and MNA. However, the parties have extensively briefed the connections between OAM and Maserati II and MNA, and therefore it is appropriate to address their arguments, especially since they provide alternative reasons for ruling against Majestic and in favor of Maserati II and MNA.

### B. The Creation of Maserati I

If OAM had succeeded to the liabilities of MAI, which it did not, then the next link between OAM and the present defendants, Maserati II and MNA, would be through the corporate transaction that created Maserati I. In November, 1989, OAM, DTI, and Alejandro DeTomaso entered into a series of agreements with Fiat Auto, the automobile subsidiary of Fiat, the result of which was that OAM contributed all of its Maserati assets to a new corporation, Maserati I, in exchange for an infusion of $105 million in capital. OAM held 51% of the Maserati I stock, and Fiat Auto held 49%. On December 31, 1989, OAM stopped, and Maserati I began, manufacturing Maserati automobiles.

 Majestic acknowledges the general proposition that the liabilities of a selling predecessor corporation are not ordinarily imposed on the buying successor corporation. *Guzman v. MRM/Elgin*, 409 Mass. 563, 566, 567 N.E.2d 929, 931 (1991). Corporate successor liability, however, can

---

4. In fact, only Maserati II is connected to OAM through Majestic's successor liability theories. MNA is wholly owned by FNA, which is wholly owned by Ferrari International, which is wholly owned by Ferrari. Ferrari also, as of 1999, wholly owns Maserati II. Accordingly, at present, Maserati II and MNA are sibling corporations under the umbrella of Ferrari, and therefore there must be a showing as to why any liabilities that Maserati II is subject to would be attributable to MNA, given the doctrine of corporate separateness. The parties have not addressed this issue.

be established in Massachusetts if the transaction meets certain exceptions to this general rule.[5] Successor liability attaches whenever there is: (1) an express or implied assumption of the predecessor's liability by the successor; (2) a de facto merger; (3) a successor corporation that is a mere continuation of the predecessor; or (4) a fraudulent transaction designed to avoid liability. *Guzman*, 409 Mass. at 566, 567 N.E.2d at 931. Majestic argues that the transaction creating Maserati I meets the first three of these exceptions, and therefore Maserati I retained the liabilities of OAM.

### 1. Express or Implied Assumption of Liabilities

In support of its theory that Maserati I expressly assumed the liabilities of OAM, Majestic cites two letters sent by MAI to Majestic in 1990 that indicated that Maserati might return to North America, as well as a press release issued by DTI. It claims that the letters and the press release were "unfair" because Maserati I had no intention of resuming North American new car operations, and the letters and press release kept former dealerships in business merely to service the used cars in circulation in North America.

Majestic contends that the same letters sent by MAI to Majestic in 1990 and the DTI press release also establish, by their language, an implied assumption of liabilities. Majestic asserts that Maserati I later acquiesced to Majestic's continuing to act as an authorized Maserati dealer after January 1, 1990. It is undisputed that

until shortly before this lawsuit, no one attempted to stop Majestic from holding itself out as a Maserati dealer. Majestic contends that at a minimum, there is a question of fact about whether an implied assumption occurred.

Maserati II and MNA point out that there is nothing in any of the agreements that expressly states that Maserati I would assume any liability. In fact, the 1989 agreement expressly provides that it "exclud[es] ... the relationship with Maserati American Imports Inc., (which will be governed *ex novo* by a new limited liability company on the basis of the contracts with the other importers)...." 1 *App. in Supp. of Defs.' and Intervenor's Mot. for Summ. J.* Ex. A.19 at 6 (English translation of November 30, 1989 Agreement between Fiat Auto and OAM).

Maserati II and MNA note that three individuals familiar with the transaction have stated that the OAM–MAI relationship was expressly excluded from the transaction creating Maserati I—the point of which (in part) was to withdraw from the North American market. Daniele Rulli, a Fiat Auto employee who was involved in the negotiations, stated in his affidavit that he drafted the above language to "reflect[ ] the parties' mutual understanding that the new company ... would not inherit the OAM–MAI relationship." 2 *App. in Supp. of Defs.' and Intervenor's Mot. for Summ. J.* Ex. E ¶ 7. On the other side of the transactions were Howard E. Chase, General Counsel to DTI, and George A. Garoutt, MAI's Executive Vice President.

---

**5.** There is another choice of law question with regard to the application of Massachusetts contract law or federal common law on the issue of successor liability. The First Circuit has held that a district court should apply state law unless the state law is hostile to federal interests. *United States v. Davis*, 261 F.3d 1, 53–54 (1st Cir.2001) (adopting Con-

necticut successor liability law even when determining liabilities under a federal statute, the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601–75 ("CERCLA")). Because applying Massachusetts law is not hostile to federal interests in this case, it is applied here.

Chase states that the "distributor relationship between OAM and MAI was not transferred to [Maserati I]." 2 *App. in Supp. of Defs.' and Intervenor's Mot. for Summ. J.* Ex. B ¶ 5. Garbutt concurs, stating that "MAI's relationship with OAM was not transferred to [Maserati I]. Rather, MAI remained under the control of DTI and continued dealings with OAM." 2 *App. in Supp. of Defs.' and Intervenor's Mot. for Summ. J.* Ex. C ¶ 5.

Moreover, argue Maserati II and MNA, in 1993, when Fiat purchased the remaining 51% of Maserati I stock from OAM, that agreement provided that "OAM shall also *continue* to bear any and all costs, expenses, responsibilities, burdens, damages, and the like, relating to matters inherent to sales effected (directly or indirectly) by OAM in the United States of America, pursuant to the laws and rules of that country." 1 *App. in Supp. of Defs.' and Intervenor's Mot. for Summ. J.* Exs. A.22 at Art. 4, ¶ D (May 17, 1993 Agreement among Fiat Auto, American Finance S.p.A., and OAM); and A.23 at Art. 4, ¶ D (English translation) (emphasis added).

Maserati II and MNA assert that there must be a showing of intent by the purchasing company to assume the old corporation's liabilities in whole or in part in order to show an implied assumption, and Majestic has not done so. They rely on *Ladjevardian v. Laidlaw–Coggeshall, Inc.,* 431 F.Supp. 834, 839–40 (S.D.N.Y.1977) (holding that "conduct or representations relied upon by the party asserting liability must indicate an intention on the part of the buyer to pay the debts of the seller"). Maserati II and MNA assert that the OAM–MAI relationship was explicitly excluded from the Maserati I creation because Maserati I had no intention whatsoever of continuing to operate in the North American market.

Maserati II and MNA also argue that there is no evidence that Maserati I took any actions that would imply that it intended to assume any of OAM's liabilities. The fact that Maserati I manufactured parts that eventually went to MAI is insufficient. It is true, Maserati II and MNA admit that Maserati I made parts, but it sold them to OAM, which in turn sold the parts to MAI, breaking any ties that Majestic seeks to establish. Second, they contend that Majestic did not rely on any such actions, as it is clear that Majestic rapidly converted its business into a used car dealership. Third, they argue that Maserati I did not benefit from any alleged franchise contract that Majestic seeks to impute to it since Maserati I was not in the North American marketplace. Finally, Maserati II and MNA point out that none of the statements by MAI (alleged to "string Majestic along" about the possibility of new Maserati automobiles returning to North America) can be attributed to Maserati I because Majestic has not shown the links of ownership that would be required, nor has it shown Maserati I authorized MAI to send the letters.

Maserati II and MNA argue that it is undisputed that Majestic never bought anything from Maserati I, and therefore Majestic's "acquiescence theory" fails. They note that there were business reasons for MAI and Majestic to maintain a relationship after Maserati I left North America—namely, so that MAI could continue selling parts to Majestic, which needed the parts to continue its Maserati repair business. Finally, Maserati II and MNA contend that Maserati I should not be penalized for failing to enforce its trademark in the United States when it was absent from the market. *See, e.g., Coco Rico, Inc. v. Fuertes Pasarell,* 738 F.Supp. 613 (D.P.R.1990) (holding manufacturer's trademark claim was not barred by laches when defendants' use of mark had been

limited to Northeastern United States and did not extend to manufacturer's market in Puerto Rico).

Majestic's contention that Maserati I expressly assumed OAM's liabilities is not supported by the record. Express assumptions are clear assertions that can be found in a written document such as a contract or a letter, or, under appropriate circumstances, in a statement. None was made here; in fact, the only known text relating to this subject is in the 1989 agreement between Fiat Auto and OAM, which specifically excludes the relationship with MAI. 1 *App. in Supp. of Defs.' and Intervenor's Mot. for Summ. J.* Ex. A.19 at 6 (English translation of November 30, 1989 Agreement between Fiat Auto and OAM). Under such circumstances, no express assumption occurred.

More nuanced, but no more successful, is Majestic's argument that Maserati I impliedly assumed OAM's liabilities. Simply put, Majestic has not uncovered any evidence regarding the critical issue of intent. *Ladjevardian,* 431 F.Supp. at 839 (requiring evidence of intent). While the 1990 letters could be construed to suggest that Majestic should continue its new car operations, there is no indication that Maserati I intended to assume any debts. Admissions of liability by officers or spokespersons are considered when determining whether sufficient evidence of intent exists, *Ladjevardian,* 431 F.Supp. at 840, but Majestic has not shown any. Indeed, the explicit exclusion of the MAI relationships in the contract between OAM and Fiat Auto creating Maserati I cuts directly against finding an intention on Maserati I's part to assume OAM's liabilities stemming from MAI. Further, it is undisputed that shortly after receiving the letters, Majestic came to the conclusion that it could not rely on the representations that Maserati automobiles would be returning to the North American market shortly, which is why Majestic transformed itself into a used car dealership. Majestic then did not detrimentally rely on the 1990 letters.

Finally, Majestic's "acquiescence theory" is little more than an allegation designed to show an implied assumption of liability by Maserati I, and it does not create liability. Because Maserati I had completely withdrawn from the North American market, it would be inequitable to require it to rigorously police the servicing of Maserati automobiles sold by OAM before Maserati I had bought the Maserati automobile business. More importantly, Maserati I's failure to stop Majestic from servicing Maserati automobiles during the 1990s is insufficient to show an intent by Maserati I to assume OAM's liabilities. As Maserati II and MNA rightly point out, MAI and Majestic were in a mutually beneficial business relationship selling and buying Maserati automobile parts in the early 1990s. MAI's desire to continue its business with Majestic undermines any affirmative showing of an intent by Maserati I to assume OAM's liabilities.

In sum, Maserati I did not expressly or impliedly assume the debts of OAM when Maserati I was created.

### 2. *De Facto Merger*

Alternatively, Majestic claims that the formation of Maserati I was the result of a de facto merger of OAM into the newly created Maserati I, which Maserati II and MNA deny. Courts are guided by four factors in determining whether a de facto merger has occurred for the purposes of establishing successor liability: (1) continuity of management, personnel, physical locations, assets, and general business operations; (2) continuity of shareholders; (3) whether the selling corporation liquidated and dissolved as soon as legally and practically possible; and (4)

whether the purchasing corporation assumed the obligations of the seller necessary for uninterrupted continuation of the seller's normal business operations. *In re Acushnet River & New Bedford Harbor Proceedings re Alleged PCB Pollution,* 712 F.Supp. 1010, 1015 (D.Mass.1989). Majestic argues that each of these factors is met.

First, Majestic points out that the same manufacturing plants made the same cars after the merger. Additionally, Alejandro DeTomaso, formerly the president of OAM, became the president of Maserati I, and four high ranking members of OAM assumed similar positions in Maserati I. As required by Italian law, the same lower-level employees of OAM were kept for Maserati I. Maserati II and MNA counter that Maserati I completely withdrew from the North American market, changing the business significantly. Maserati I sought to rid itself of the North American market, and therefore, Maserati II and MNA conclude, it should not be attributed to have kept those liabilities, even if it kept other business sections operating. Further, only one officer, DeTomaso overlaps.

Second, Majestic contends that there was a continuity of shareholders as well, as OAM gained 51% of the stock of Maserati I, and OAM was owned (84%) by DTI, which was owned by DeTomaso. As a result, DeTomaso remained the primary shareholder throughout. However, Maserati II and MNA reply that Majestic's description vastly oversimplifies the situation. It ignores the fact that Fiat Auto paid $105 million in consideration for a 49% equity stake. Thus, there was a significant change in ownership. Furthermore, OAM was later bought out (in 1993) by Fiat Auto, eliminating all continuity of shareholders.

Third, Majestic claims that OAM ceased its business and eventually dissolved. Maserati II and MNA challenge this argument as simply false: OAM, as a holding company, was not an empty shell. As recently as 2001, OAM made SEC filings revealing that it has considerable value. Trident Rowan Group, Inc. (formerly DTI) bought out the 16% interest in OAM that was owned by DaimlerCrysler in March, 2001. Maserati II and MNA conclude that this fact alone precludes the finding of a de facto merger.

Fourth, Majestic argues that Maserati I assumed the obligations of OAM to keep normal business operation going though employee severance and agreements with dealerships. Maserati II and MNA again object that Maserati I did not continue the normal business operations in North America—quite the contrary, it ceased them altogether.

The transaction that created Maserati I is best seen as an attempt to save a financially troubled corporation by limiting its expenditures while adding needed capital to keep the remaining operations afloat. OAM was unsuccessfully manufacturing Maserati automobiles in Italy. The United States was a particularly troubled market because of its lemon laws and safety and emissions requirements, by which OAM could not abide on a profitable basis. Accordingly, OAM entered into an agreement with Fiat Auto to create a new corporation, Maserati I, which would not manufacture cars for the United States, by transferring the manufacturing part of OAM's operations to the new corporation, in exchange for $105 million from Fiat Auto. This transaction, which left OAM still in business selling parts to MAI in the United States, is not a de facto merger of OAM into Maserati I.

Normally, a de facto merger contemplates the absorption of one corporation by another. Here, a new corporation was formed from the assets of two other companies, OAM and Fiat Auto, and both re-

mained in business after the transaction. Many of the critical elements of OAM's old car manufacturing business were indeed the same as Maserati I's, most notably the factories and employees in Italy, but not everything remained the same. The most important fact is undisputed: while OAM manufactured cars for worldwide distribution, Maserati I excluded the North American market from its business. This act was a perfectly permissible, non-discriminatory market withdrawal.

As the First Circuit has held, "[o]ne of the key requirements for a merger under traditional corporation law doctrine is 'continuuity of shareholders,' which is found where the purchaser corporation exchanges its own stock as consideration for the seller corporation's assets so that the shareholders of the seller corporation become a constituent part of the purchaser corporation." *Dayton v. Peck, Stow and Wilcox Co. (Pexto)*, 739 F.2d 690, 693 (1st Cir.1984). Although OAM obtained a 51% interest in Maserati I, Fiat Auto—a new player—held 49% of Maserati I's shares. Thus, because of Fiat Auto's presence, the Maserati I board of Directors differed significantly, but not entirely, from the OAM Board of Directors.

Notably, OAM did not cease its operations after the transaction, a typical hallmark of a de facto merger. Majestic's claim that OAM was merely a holding company does not disprove the fact that OAM continued to exist, nor does it address how a "mere" holding company would continue to sell automobile parts to MAI. Maserati I did continue some of the normal business operations of OAM, but it did not continue OAM's North American business, which is the largest car market in the world.

In sum, Maserati I was not the result of a de facto merger, and successor liability cannot be passed on through this narrow exception to the general rule that corporate entities are presumed to be separate.

### 3. Mere Continuation of a Predecessor Corporation

■ In a second alternative argument, Majestic asserts that even it Maserati I was not the result of a de facto merger, it was a mere continuation of OAM. Maserati II and MNA disagree. There are two tests for determining whether a successor corporation is a mere continuation of a predecessor corporation. The traditional "indices of a 'continuation' are, at a minimum: continuity of directors, officers, and stockholders; and the continued existence of only one corporation after the sale of assets." *McCarthy v. Litton Indus., Inc.*, 410 Mass. 15, 23, 570 N.E.2d 1008, 1013 (1991) (citation omitted). The other, broader test analyzes whether "the successor corporation more closely resembles a reorganized version of its predecessor than an entirely new corporation entity." *Nichols v. Roper–Whitney Co.*, 843 F.Supp. 799, 804 (D.N.H.1994) (quoting 2 Louis R. Frumer & Melvin I Friedman. *Products Liability* § 7.04[4] (1993)).

Majestic insists that Maserati I meets both of the above tests under the facts alleged above in II.B.2. Maserati II and MNA respond that because OAM continued to exist after the creation of Maserati I, it cannot be a "mere continuation." Further, Maserati II and MNA point out that the second, and more expansive test, applies only to product liability cases, and therefore is not applicable here. They assert that Massachusetts is unlikely to adopt such a test given the Supreme Judicial Court's earlier characterization of it as "distinctly a minority approach." *McCarthy*, 410 Mass. at 23 n. 6, 570 N.E.2d at 1013 n. 6.

*McCarthy* remains the law in Massachusetts, and the narrower, traditional test to

determine "mere continuations" applies. As with the de facto merger analysis above, while there was some continuity of shareholders and management, there was a significant change as a result of the investment of Fiat Auto in Maserati I. More importantly, as the *McCarthy* Court itself notes, "[e]ven under [the] broader standard, however, dissolution of the predecessor corporation is required ...," which, as in *McCarthy*, has not occurred here. *McCarthy*, 410 Mass. at 23, 570 N.E.2d at 1013. OAM remained a viable and operating company after the transaction that created Maserati I, and therefore Maserati I cannot as a matter of Massachusetts law, be a "mere continuation" of OAM.

The result of this analysis is that, even if MAI somehow passed on its liabilities to OAM, which it did not, OAM did not pass on its liabilities to Maserati I. Maserati I did not assume OAM's debts because Maserati I did not expressly or impliedly assume those debts, nor was it the result of a de facto merger, nor was it the mere continuation of OAM.

### C. The Creation of Maserati II

Majesti contends that the next link in the chain of successor liability, the transactions that led to the creation of Maserati II,[6] establishes successor liability for Maserati II and MNA. Majestic's arguments on this point are stronger than its earlier positions. However, given the earlier determinations in Sections II.A and II.B, there is no need to address these issues, as

the chain of successor liability has been broken in two places already: between MAI and OAM and between OAM and Maserati I.

### III. Majestic's Counts Against Maserati II and MNA

The parties agree that Majestic's complaint cannot go forward without establishing successor liability, which it has failed to do. However, as addressed seriatim below, most, but not all, of Majestic's Counts fail on the merits as well.

### A. Violation of M.G.L. ch. 93B Against Maserati II (Counts II and III) and MNA (Count VII)

Chapter 93B of the Massachusetts General Laws was enacted to protect automobile dealers from oppressive tactics from automobile manufacturers, and bans certain unfair practices. Majestic alleges that Maserati II violated four subsections [7] and MNA violated six subsections [8] of M.G.L. ch. 93B, § 4.

Because the briefing on Majestic's specific allegations is sparse and the application of the existing facts to the law is not clear, if successor liability were established against either Maserati II or MN ... it is unclear whether material questions of fact would exist as to the allegations under M.G.L. ch. 93B. Accordingly, summary judgment is granted to Maserati II and MNA on these two Count because no successor liability exists, but no ruling is made on the merits of Majestic's M.G.L. ch. 93B claims.

---

**6.** It is undisputed that in 1993, when Fiat Auto bought out OAM's 51% interest in Maserati I, making Maserati I the wholly-owned subsidiary of Fiat Auto, the liabilities of Maserati I did not change (although Maserati II and MNA do point out that this stock purchase removed the remaining direct tie between them and OAM). Accordingly, the next relevant transaction that might affect successor liability is the one that created Maserati II.

**7.** Specifically, M.G.L. ch. 93B, §§ 4(1), 4(3)(b), 4(3)(k), and 4(3)(e).

**8.** Specifically. M.G.L. ch. 93B, §§ 4(1), 4(3)(a), 4(3)(b), 4(3)(c), 4(3)(e), and 4(3)(*l*).

### B. Breach of Contract Against Maserati II (Count IV)

■ Majesti argues that Maserati II breached the contract Majestic signed with MAI. Maserati II asserts that this Count fails because the 1989 Standard Dealer Agreement between Majestic and MAI provided that it would automatically terminate "in the event of the termination of Vehicle sales in the United States of America or if MAI is no longer the sole U.S. importer of Products, or if MAI's method of distribution shall substantially change." The termination of vehicle sales occurred in January, 1990, MAI ceased operations as the sole importer of Products in December, 1994 (when it sold the remainder of its parts inventory), and therefore Maserati II concludes the contract terminated by its own provisions.

Majestic responds that there was an implied contract between the parties. Maserati II replies that there is no evidence of any such contract.

If successor liability had been established by Majestic, Maserati II would still be entitled to summary judgment on Count IV because the contract between Majestic and MAI terminated by its own terms on approximately January 1, 1990, when new car sales stopped in the United States. Moreover, Majestic has not presented sufficient evidence to establish that an implied contract arose between the parties that would resurrect its breach of contract claim.

### C. Violation of the Automobile Dealers Day in Court Act. 15 U.S.C. § 1221, Against Maserati II (Count V) and MNA (Count VIII)

The Automobile Dealers Day in Court Act provides for damages against manufacturers that fail to "[a]ct in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise." 15 U.S.C. § 1221. Good faith is defined in the Dealers Act as "to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party...." 15 U.S.C. § 1221(e).

Majestic claims that it has shown bad faith by Maserati II and MNA, in the requisite sense of demonstrating "coercion or intimidation," through the October, 1999 letter sent by FNA demanding that Majestic stop holding itself out as a Maserati dealer or else a lawsuit would ensue.

Maserati II and MNA reply that writing a cease-and-desist letter in at attempt to protect their trademark cannot constitute bad faith.

■ Although there is no manufacturer-dealer relationship that is enforceable against either Maserati II or MNA, as discussed above in Section II, Counts V and VIII also fail because Majestic has not demonstrated bad faith as required under the Dealers Act. A cease-and-desist letter, while certainly an action taken in an effort to make another party stop its activities, does not automatically constitute a failure to exercise good faith under the Dealers Act. A failure to act in good faith must exhibit "coercion, intimidation, or threats of coercion or intimidation from the other party ..." to create liability under the Dealers Act. 15 U.S.C. § 1221(e); *Wallace Motor Sales, Inc. v. American Motors Sales Corp.*, 780 F.2d 1049, 1056 (1st Cir. 1985) (adopting narrow interpretation given Dealers Act). The clause is not construed liberally. *See, e.g., Autohaus Brugger, Inc. v. Saab Motors, Inc.*, 567 F.2d 901, 911 (9th Cir.1978), *cert. denied*, 436 U.S. 946, 98 S.Ct. 2848, 56 L.Ed.2d 787 (1978); *Milos v. Ford Motor Co.*, 317 F.2d 712, 715 (3rd Cir.1963), *cert. denied*, 375

U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 125 (1963). In the First Circuit,

> the coercion or intimidation must include a wrongful demand that would result in penalties or sanctions if not complied with .... [and] the coercion or intimidation must be actually; the mere fact that a dealer may have felt it had been coerced or intimidated is not sufficient.

*Wallace Motor Sales,* 780 F.2d at 1056.

■ The cease-and-desist letter at issue here was a demand that fits the typical "either-or" structure of demands sometimes prohibited by the Dealer's Act, *Fray Chevrolet Sales, Inc. v. General Motors Corp.,* 536 F.2d 683, 685 (6th Cir.1976), but it was not a wrongful demand, as FNA had a proper trademark infringement claim to bring against Majestic. Majestic does not contend that Ferrari's trademark counterclaim is frivolous. Summary judgment on Counts V and VIII would be appropriate for Maserati II and MNA even if successor liability existed.

### D. Unfair or Deceptive Trade Practices, M.G.L. ch. 93A, Against Maserati II (Count VI)

■ The Massachusetts Consumer Protection Statute, M.G.L. ch. 93A, allows suit for unfair or deceptive acts or practices. When determining whether an act or practice is either unfair or deceptive, courts must "focus on the nature of challenged conduct and on the purpose and effect of that conduct as the crucial factors in making a G.L. c. 93A fairness determination." *Massachusetts Employers Ins. Exchange v. Propac–Mass, Inc.,* 420 Mass. 39, 42–43, 648 N.E.2d 435, 438 (1995). Courts "look for conduct which is (1) within 'at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) ... is immoral, unethical, oppressive, or unscrupulous ....' " when making a determination of whether a

sufficient level of unfairness has been met. *Levings v. Forbes & Wallace, Inc.,* 8 Mass. App.Ct. 498, 504, 396 N.E.2d 149, 153 (1979) (citation omitted).

■ Majestic asserts that the totality of Maserati II's actions constitutes unfair and deceptive trade practices prohibited by the Massachusetts Consumer Protection statute. M.G.L. ch. 93A, §§ 2 and 11. Maserati II denies that its actions amounted to such conduct.

Maserati II's actions, including those ascribed to Maserati I, OAM, and MAI, could not be found by a reasonable juror to be unfair or deceptive. A complete and nondiscriminatory withdrawal from a market, undertaken for legitimate business reasons, does not amount to "immoral, unethical, oppressive, [or] unscrupulous" behavior as required under M.G.L. 93A, *Levings,* 8 Mass.App.Ct. at 504, 396 N.E.2d at 153 (citation omitted), nor does the reintroduction of new Maserati automobile into the United States market exclusively at pre-existing Ferrari dealerships twelve years later. The decision to leave the North American new car market was a reasonable one given the trouble that OAM experienced in the late 1980s making a profit in the United States. It is permissible to make business decisions that have adverse effects on other businesses when such decisions are made without animus or discriminatory intent. It is also reasonable that Ferrari, which wholly owns the Maserati II, would wish to use its existing Ferrari dealerships in the United States to reintroduce new Maserati automobiles. There are significant business advantages to doing so, as Majestic acknowledged at oral argument. Since no reasonable juror could find that Maserati II acted unfairly or deceptively, summary judgment as to Count VI should be granted to Maserati II on the merits as well as on grounds of no successor liability.

## IV. Ferrari's Counterclaims Against Majestic

■ Ferrari claims that Majestic's display of Maserati trademarks [9] at its business violates the Lanham Act, 15 U.S.C. §§ 1114 (infringement), 1125(a) (false designation), and 1125(c) (dilution).

### A. Trademark Infringement and False Designation

■ In the First Circuit, "[t]o win a trademark case [under 15 U.S.C. §§ 1114 or 1125(a) ], a plaintiff must show 1) that he uses, and thereby 'owns,' a mark, 2) that the defendant is using that same or a similar mark, and 3) that the defendant's use is likely to confuse the public, thereby harming the plaintiff." *DeCosta v. Viacom Int'l, Inc.*, 981 F.2d 602, 605 (1st Cir.1992), *cert. denied*, 509 U.S. 923, 113 S.Ct. 3039, 125 L.Ed.2d 725 (1993).

Ferrari notes that it owns the Maserati marks by virtue of a November 24, 1999 assignment from the company formerly known as Maserati I. Majestic admits that it is displaying the marks at its place of business, and, Ferrari asserts, the point of the display is to create the impression that Majestic is a dealer. Majestic makes little effort to defend its actions if it loses on its claims against Maserati II and MNA. In fact, Majestic concedes that the outcome of this counterclaim is contingent on whether it has a valid claim to a franchise.

■ Since Majestic does not have a valid claim to a Maserati dealership, it is infringing Ferrari's Maserati trademark by placing signs at its business and holding itself out as a Maserati dealership. There is no dispute that Ferrari lawfully owns the trademark to Maserati or that Majes-

tic is using the Maserati marks at its business. It is also clear that Majestic's use would "confuse" consumers into believing it is a Maserati dealership, when, as determined above, it is not. Summary judgment is granted to Ferrari as to Counts I and II of its counterclaim.

### B. Trademark Dilution

■ To succeed on a claim for trademark dilution, a plaintiff "has the burden of proof to show (1) that it owns a famous mark, (2) that the defendant is making commercial use of the mark in commerce, (3) that the defendant adopted its mark after the plaintiff's mark became famous, and (4) that the defendant's mark dilutes the plaintiff's famous mark." *Hasbro, Inc. v. Clue Computing, Inc.*, 66 F.Supp.2d 117, 130 (D.Mass.1999), *aff'd*, 232 F.3d 1 (1st Cir.2000) (citation omitted).

■ Because the parties have not addressed Ferrari's dilution claim in any detail whatsoever, summary judgment is denied in part as to Count III, even though Majestic appears to admit that such a ruling would follow should Majestic lose on its claim to a Maserati franchise. The critical and only disputable element in Count III is whether Majestic's use of the Maserati marks "dilutes" them, "Dilution," as defined by the statute, is "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) the likelihood of confusion, mistake or deception." 15 U.S.C. § 1127. The two kinds of dilution are tarnishment and blurring; Ferrari does not specify which it alleges

---

**9.** To be entitled to any form of trademark protection, a plaintiff must establish three prerequisite elements: the "marks (a) must be used in commerce, (b) must be non-function-al, and (c) must be distinctive." *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 36 (1st Cir.1998). Majestic has not disputed that these prerequisites exist here.

Majestic did by holding itself out as a Maserati dealer.

Tarnishment is usually found in contexts that associate a product with obscenity, crime, or sex, although it is not limited to such matters. "The sine qua non of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use." *Hormel Foods Corp. v. Jim Henson Productions, Inc.,* 73 F.3d 497, 507 (2nd Cir.1996). Ferrari has produced no evidence that the quality of Majestic's work repairing Maserati automobiles is below the general standard set out by Maserati in general. Nor has it produced any evidence to establish that its Maserati trademarks will suffer negative associations because of Majestic's use of them. Accordingly, Ferrari has not established tarnishment, and therefore summary judgment is denied as to Count III of its counterclaim under that theory. Furthermore, because the evidence could not establish tarnishment, summary judgment is granted to Majestic as to this part of Count III.

The other variety of dilution, blurring, "may occur where the defendant uses or modifies *the plaintiff's trademark* to identify *the defendant's goods and services,* raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." *Deere & Co. v. MTD Prods., Inc.,* 41 F.3d 39, 43 (2nd Cir.1994) (emphasis in original). Here, of course, Majestic has not altered Ferrari's Maserati trademarks, it has appropriated them. If Ferrari contends that "blurring" has occurred, it may well have, but the lack of briefing and the unclear factual record as to this issue precludes a ruling in its favor. Summary judgment is denied for both sides as to the "blurring" theory of dilution in Count III of Ferrari's counterclaim.

## C. Appropriate Remedies

Having ruled in Ferrari's favor on two of its trademark counterclaims, the form of judgment should be addressed. Ferrari is entitled to appropriate relief, and seeks injunctive relief, as well as triple camages, costs, and attorney's fees. Plainly, Ferrari is entitled to injunctive relief of some variety, but the issue of damages is more thorny. Damages are governed by 15 U.S.C. § 1117, which provides in pertinent part:

When a violation of any right of the registrant of a mark ... shall have been established ..., the plaintiff shall be entitled ... subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.... In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

It is clear from the above text that principles of equity are firmly intertwined with a default position that damages should be awarded.

In light of the facts of the case as currently presented, triple damages, could damages be proven, are unlikely here. Majestic's actions for the past twelve years have not seriously harmed Ferrari, and perhaps have not harmed Ferrari at all. Majestic's attempt to retain its Maserati

franchise through this litigation was undertaken in good faith and appears at present to have done no serious harm to Ferrari either.

## V. Conclusion

Majestic's motion for summary judgment is denied, except that summary judgment is granted as to the issue of trademark dilution through tarnishment. Maserati II's, MNA's, and Ferrari's motion for summary judgment is granted, except as to Count III of Ferrari's counterclaim.

The parties shall submit, on notice, proposed forms of an injunction by January 4, 2002.

It is so ordered.